P. DAVIS OLIVER (DC Bar No. 490620)
*pro hac vice pending*
Email: oliverp@sec.gov
JOHN M. MCNULTY (DC Bar No. 1009211)
*pro hac vice pending*
Email: mcnultyj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549
Telephone: (202) 551-8920

LOCAL COUNSEL
STEPHEN KAM (Cal. Bar No. 327576)
Email: kams@sec.gov
Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.  8:24-cv-01460 |
| Plaintiff, | |
| vs. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| JOHN J. KRALIK V, JKV CAPITAL, LLC, and JKV LLC, | |
| Defendants, and | **DEMAND FOR JURY TRIAL** |
| JKV HOMES, LLC, | |
| Relief Defendant. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this action under Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(d), 78u(e), and 78aa(a).

2.    Defendants John J. Kralik V ("Kralik"), JKV Capital, LLC ("JKV Capital"), and JKV LLC, along with Relief Defendant JKV Homes, LLC ("JKV Homes") have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

3.    Venue is proper in this district under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant Kralik resides in this district, and the principal places of business of Defendants JKV Capital and JKV LLC and Relief Defendant JKV Homes are in this district.

## SUMMARY

4.    Defendants Kralik, JKV Capital, and JKV LLC raised more than $16.9 million from dozens of people who invested in multiple real estate investment funds they manage. The Defendants promised those investors to both preserve the value of their investments and pay investors profits from "flipping" or renting residential real estate. Instead, Kralik and JKV LLC misappropriated more than $1.6 million of investor money and spent it on expenses such as Kralik's Mercedes-Benz, his house, a vacation in Mexico, and other personal expenses for Kralik.

1

5.     Kralik also improperly took investor money to pay operating expenses of the entity that manages the real estate funds, JKV Capital. And Kralik and JKV LLC further betrayed their promises by transferring additional millions of dollars of investor money between the five (purportedly separate) real estate funds. These transfers were both fraudulent in their own right and were used for improper purposes such as Ponzi-like distribution and redemption payments to investors in other funds. At times, these transfers concealed shortfalls in a particular fund. Kralik, JKV Capital, and JKV LLC also concealed their fraud by issuing false capital account statements to investors.

6.     As the scheme began to unravel, in or around January 2023, Kralik admitted to an investor that Kralik was in trouble because Kralik had used investor money to cover certain JKV Capital operating expenses and that a lot of investor money was gone. In a subsequent meeting with that investor and other investors, Kralik again admitted that he had taken money from the funds to pay JKV Capital operating expenses. At that meeting, when an investor asked Kralik if that meant Kralik had used investor money fraudulently, Kralik responded "Yes." But the fraud was even broader than Kralik let on—he not only took investor money for unjustified expenses, he stole investor money for his personal enrichment.

7.     The Defendants' fraudulent scheme spanned from late 2017 through at least March 2024 (the "Relevant Period"). Between late 2017 and March 2022, Kralik, JKV Capital, and JKV LLC raised more than $16.9 million from about 35 investors. One of those 35 investors was a "feeder fund" not controlled by Kralik. That feeder fund itself has 68 investors. Thus, in total, the Defendants' fraud victimized more than 100 people. Even after the Defendants stopped soliciting new investments, they continued the fraud through at least March 2024 by continuing to make improper transfers between the real estate funds.

8.    Defendants Kralik, JKV Capital, and JKV LLC manage, and solicited investments in, five different real estate investment funds (each referred to in this Complaint as a "JKV Fund" or the "JKV Funds"):

     a.    JKV Opportunities Fund 1, LP ("Fund I");

     b.    JKV Opportunities Fund II, LP ("Fund II");

     c.    JKV Investors A, LP ("Investors A");

     d.    JKV Investors C, LP ("Investors C"); and

     e.    Treasure Valley Rental Fund LP ("Treasure Valley").

9.    Each JKV Fund's stated purpose is to purchase and renovate homes in California and other states for rent or resale, with investors in each particular fund getting payments from the rent or resale profits of properties owned and renovated by that particular fund.

10.    The JKV Funds are structured as limited partnerships, with an ownership and control structure that puts Kralik in charge. For each fund, JKV Capital is the general partner and has sole control over the management and business affairs of that fund. JKV LLC is the manager and majority owner of JKV Capital and controls the affairs of JKV Capital. In turn, Kralik owns 100% of JKV LLC and controls its decisions. The result of this ownership and control structure is that Kralik controls JKV LLC, JKV Capital, and the management and business affairs of each JKV Fund.

11.    JKV Fund investors bought securities in the form of limited partnership units in a particular fund, and investors were to share any profits with other limited partners in the particular fund and with the general partner, JKV Capital.

12.    For each JKV Fund, offering documents state that investor money would be used for that fund's business and to pay returns to investors in that fund. In reality, Kralik, JKV Capital, and JKV LLC misappropriated and misused millions of dollars of investor money in three main ways.

13.    First, Kralik misappropriated investor money for his personal use. He did this by transferring money from the JKV Funds to JKV LLC and then using it for

personal expenses such as lease payments for his $198,000 Mercedes-Benz, mortgage payments for his personal residence, a vacation in Mexico, and transfers to his personal securities trading account. Kralik also transferred investor money (both directly and through JKV LLC) to his wholly-owned entity JKV Homes—an entity Kralik used for personal real estate investments unrelated to the JKV Funds.

14. Second, Kralik directed unauthorized transfers of investor money to JKV Capital. While JKV Capital was entitled to certain management and performance fees for its role as general partner, these illicit transfers were separate from those fees. Some of the illicit transfers covered JKV Capital's operating expenses and employee salaries, uses that were specifically prohibited in Fund I's documents.

15. Third, Kralik improperly directed transfers of money between JKV Funds. Sometimes these transfers went directly from one fund to another fund. Other times the money was first transferred to JKV LLC as an intermediary and then transferred to another JKV Fund. Some of these transfers out of a JKV Fund were used for Ponzi-like distribution or other payments to investors in a different JKV Fund. In addition, Kralik improperly directed transfers from one JKV Fund to pay the expenses of another fund.

16. Kralik's and JKV Capital's pitch to potential investors in Fund I and Fund II highlighted capital preservation as a key feature. Contrary to those representations, and contrary to the Defendants' representations about how investor money would be used, the Defendants misappropriated and misused investor money. This had the predictable result of depleting—not preserving—investors' capital.

17. After Kralik learned about the SEC staff's investigation in early 2023, he assured at least one investor that he would return their capital contributions, but then failed to do so. Kralik also sold some properties and made payments to certain investors but not others, apparently favoring investors with whom he had a personal connection. In addition to these attempts to placate some investors, Kralik also

continued to direct improper fund-to-fund transfers through at least early 2024, well after he knew of the SEC's investigation.

18.    Kralik also failed to appear to give testimony in the SEC staff's investigation (despite having been served with a subpoena to do so), and even failed to provide a date on which to reschedule the testimony.

19.    As a result of the alleged conduct, the Defendants violated the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Kralik is also liable as a control person for JKV Capital's and JKV LLC's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder pursuant to Section 20(a) of the Exchange Act.

20.    The SEC seeks a judgment from the Court: (i) permanently enjoining the Defendants from violating Securities Act Section 17(a), 15 U.S.C. §77q(a), and Exchange Act Section 10(b), 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (ii) directing the Defendants to disgorge all ill-gotten gains they received as a result of the acts and/or courses of conduct complained of, plus prejudgment interest thereon; (iii) directing the Defendants to pay civil money penalties; (iv) barring Kralik from serving as an officer or director of a public company; (v) ordering Relief Defendant JKV Homes to disgorge any ill-gotten gains, plus prejudgment interest thereon; and (vi) granting such other relief as this Court may determine to be just, equitable, and necessary.

## DEFENDANTS

21.    **John J. Kralik V ("Kralik")**, age 43, resides in Newport Beach, California, in this district. Kralik is the CEO and Managing Partner of JKV Capital and owns 55.02% of JKV Capital's outstanding shares through his wholly-owned entity JKV LLC. Through JKV Capital and JKV LLC, Kralik operates and manages the JKV Funds. Kralik and JKV Capital also manage other real estate investment funds. Previously, from 2009 to 2017, Kralik was president of an unrelated real estate

investment firm. Until recently, Kralik had been an active member of an organization for company officers and directors. Kralik has signed a tolling agreement that suspends the running of the statute of limitations from September 19, 2023 through July 2, 2024.

22.     **JKV Capital, LLC ("JKV Capital")** is a California limited liability company with its principal place of business in Newport Beach, California, in this district. JKV Capital's business involves acquiring, owning, managing, and operating homes. JKV Capital is the general partner and manages the operations of the JKV Funds. JKV Capital has signed a tolling agreement that suspends the running of the statute of limitations from September 19, 2023 through July 2, 2024.

23.     **JKV LLC** is a California limited liability company with its principal place of business in Newport Beach, California, in this district. Kralik owns 100% of JKV LLC and is its only member and manager. JKV LLC is listed as the manager of JKV Capital in fund agreements and the JKV Capital amended operating agreement. JKV LLC has signed a tolling agreement that suspends the running of the statute of limitations from March 14, 2024 through July 2, 2024.

**RELIEF DEFENDANT**

24.     **JKV Homes LLC ("JKV Homes")** is a California limited liability company with its principal place of business in Newport Beach, California, in this district. Kralik formed JKV Homes in November 2019 and owns 100% of its outstanding shares through JKV LLC. JKV LLC is the manager and only member of JKV Homes.

**RELATED ENTITIES**

25.     **JKV Opportunities Fund 1, LP ("Fund I")** is a California limited partnership with its principal place of business in Newport Beach, California, in this district. JKV Capital is the general partner of Fund I. Fund I started raising investor money in late 2017.

26.    **JKV Opportunities Fund II, LP ("Fund II")** is a California limited partnership with its principal place of business in Newport Beach, California, in this district. JKV Capital is the general partner of Fund II. Fund II started raising investor money in late 2019.

27.    **JKV Investors A, LP ("Investors A")** is a California limited partnership with its principal place of business in Newport Beach, California, in this district. JKV Capital is the general partner of Investors A. Investors A started raising investor money in early 2020.

28.    **JKV Investors C, LP ("Investors C")** is a California limited partnership with its principal place of business in Newport Beach, California, in this district. JKV Capital is the general partner of Investors C. Investors C started raising investor money in early 2020.

29.    **Treasure Valley Rental Fund LP ("Treasure Valley")** is a Nevada limited partnership with its principal place of business in Newport Beach, California, in this district. JKV Capital is the general partner of Treasure Valley. Treasure Valley started raising investor money in mid-2020.

### OTHER RELEVANT PERSON

30.    **Accountant A** provided outsourced accounting services for the Defendants from about January 2022 to August 2022 and again from about December 2022 to April 2023. Accountant A raised concerns to Kralik about some of the improper money transfers discussed in this Complaint.

### FACTUAL ALLEGATIONS

### A.    Kralik, JKV Capital, and JKV LLC Offered and Sold Securities.

31.    From late 2017 to March 2022, Kralik, JKV Capital, and JKV LLC raised over $16.9 million for the five JKV Funds from about 35 investors, including from the feeder fund (itself with 68 investors) that invested in Fund II. Many of Kralik's investor victims are located in the southern California area, but others reside in other states, including New York, Louisiana, Pennsylvania, and Texas.

32.    The chart below shows the approximate amount raised and number of investors for each JKV Fund (some investors invested in more than one fund):

| Fund Name | Amount Raised | Number of Investors (sub-investors) |
|-----------|---------------|-------------------------------------|
| Fund I | $7,500,000 | 28 |
| Fund II | $3,950,000 | 7 (68) |
| Investors A | $1,000,000 | 2 |
| Investors C | $425,000 | 1 |
| Treasure Valley | $4,075,000 | 3 |

33.    To raise money for each JKV Fund, Kralik and other JKV Capital employees solicited their professional or personal contacts and existing investors and obtained referrals from existing investors. Kralik and JKV Capital also promoted Fund I and Fund II on JKV Capital's public website and promoted Fund II via the feeder fund's public website. The feeder fund's website included links to Fund II offering documents. Kralik and JKV Capital also produced a video in which Kralik personally advertised Fund II and featured many statements by Kralik. Kralik authorized posting that video on the feeder fund's website to solicit potential Fund II investors.

34.    Once Kralik or other JKV Capital employees contacted potential investors, they sent them offering materials for the JKV Funds, typically consisting of a private placement memorandum ("PPM"), limited partnership agreement ("LP Agreement") and/or subscription agreement. Kralik and JKV Capital employees typically sent these offering materials to potential investors by email.

35.    JKV Fund documents describe the offerings as involving securities or being conducted as private placements pursuant to certain provisions of the securities laws. For example, the PPM and subscription agreements for Fund I and Fund II refer to the limited partnership units as securities. Similarly, the subscription agreements

for Investors A, Investors C, and Treasure Valley state that the offerings of limited partnership units were being conducted as private placements pursuant to registration exemptions under the Securities Act.

36. Additionally, in December 2017, Kralik, as Fund I's manager, signed a Form D Notice of Exempt Offering of Securities for Fund I. This Form D was filed with the SEC on December 6, 2017. In December 2019, Kralik, as Fund II's president/managing member signed a Form D Notice of Exempt Offering of Securities for Fund II. This Form D was filed with the SEC on December 4, 2019.

37. For each fund, investor money was deposited in checking accounts in the name of the JKV Fund they invested in. For four funds (Fund I, Fund II, Investors A, and Treasure Valley), investor money was pooled into a checking account for that fund with the money from other investors in that fund.

38. Investors C fund has only one investor. While the LP Agreement for Investors C permitted up to 100 limited partners, Kralik and JKV Capital were only able to raise $425,000 from one investor who received Class A limited partnership units in this fund.

39. LP Agreements for each of the five JKV Funds provide that investors are entitled to a pro-rata share of that funds' profits or losses, part of which is split with the general partner. For example, Class A limited partners in Investors A fund are entitled to a preferred return on their invested capital. Once the Class A limited partners have received that preferred return, they split the remaining net profits with the fund's general partner and Class B limited partners, with 80% of net profits from operating income going to the investors on a pro rata basis and the remaining 20% of net profits from operating income going to JKV Capital. Class B limited partners receive no allocation of profits nor any distributions until the Class A limited partners have received their preferred return. The LP Agreements for the other JKV Funds contain similar language though the profit splits and preferred return amounts differ.

40.    LP Agreements for each JKV Fund provide that investors become limited partners of that particular fund. As limited partners, investors have no part in the management or control of the JKV Funds. Rather, JKV Capital serves as general partner of each JKV Fund, manages the business of each JKV Fund, and is responsible for generating any profits.

**B.    Kralik, JKV Capital, and JKV LLC Each Actively Participated in the Fraud.**

41.    Kralik manages JKV Capital, the general partner of the funds, through his wholly-owned entity JKV LLC. JKV LLC is the manager and majority owner of JKV Capital. JKV Capital, JKV LLC, and Kralik are parties to the LP Agreements with investors, the JKV Capital operating agreement, and certain other fund documents, including promissory notes, and subscription agreements. Many of the LP Agreements were signed by Kralik on behalf of JKV LLC on behalf of JKV Capital, with a signature block such as the one below:

GENERAL PARTNER: JKV CAPITAL, LLC

By: its Manager, JKV LLC

By: *John Kralik*    01/03/2020
Name: John Kralik
Title: Managing Member

32

42.    The JKV Capital PPMs for Fund I and Fund II identify JKV Capital as the general partner of Fund I and Fund II. These PPMs also identify Kralik as a manager of Fund I and Fund II. JKV Capital also is listed as the general partner on most of the JKV Fund subscription agreements, in which limited partnership units were offered and investors agreed to purchase limited partnership units. In most of these subscription agreements, JKV Capital accepted investors' subscriptions for limited partnership units on behalf of the funds. The subscription agreements for

Fund II, Investors A, Investors C, and Treasure Valley also list Kralik as the manager of JKV Capital, which is in turn General Partner of the JKV Fund, or as manager of the JKV Fund for purposes of accepting or agreeing to investors' subscriptions. This is reflected in signature blocks such as this one:



43.     Kralik founded, exercised control over, and had decision-making authority for JKV Capital and JKV LLC. Not only is Kralik the sole owner of JKV LLC, which is the majority owner of JKV Capital, but also:

    a.  Kralik approved the content on the JKV Capital website, which describes its business as managing residential real estate investment funds and provides a means for investors and prospective investors to obtain more information.

    b.  In the video on the feeder fund's website, Kralik introduces himself as the founder and CEO of JKV Capital, a real estate investment firm.

    c.  Kralik is a signatory on the bank accounts held by JKV Capital and JKV LLC.

    d.  Kralik directed employees to make transfers between JKV Fund accounts and accounts held by JKV LLC and JKV Capital.

44.     Because, at all relevant times, Kralik exercised control over JKV Capital and JKV LLC, Kralik's knowledge, recklessness, and negligence, as detailed below, can be imputed to his companies.

45.    Additionally, Kralik, either directly or through JKV Capital and/or JKV LLC, exercised control over and had decision-making authority for each of the JKV Funds. For example:

    a.   Kralik helped prepare and had final sign-off on the PPMs.

    b.   Kralik helped prepare the LP Agreements and subscription agreements for the JKV Funds, and also signed many subscription agreements as manager of JKV Capital (or as manager of the JKV Fund).

    c.   Kralik is a signatory on the bank accounts held by each of the JKV Funds.

    d.   Kralik directed employees to make transfers between JKV Fund accounts and accounts held by other JKV Funds or his other entities.

    e.   Kralik provided information for, and had final approval of, the JKV Funds' books and records.

    f.   Kralik solicited investors for the JKV Funds, including serving as the presenter in the video posted on the feeder fund's website to raise money for Fund II.

    g.   Investors for some JKV Funds were directed to send executed investment documents to Kralik's attention at his JKV Capital email address.

    h.   Kralik approved quarterly capital account statements provided to JKV Fund investors.

    i.   Kralik approved distributions and redemptions and dealt with complaining investors.

**C.    The Defendants Made Materially False and Misleading Misstatements Regarding the Funds and Investor Money.**

**1.    The Defendants Made Materially False and Misleading Statements About the Purpose of the Funds.**

46.    The PPMs and LP Agreements for each fund contain materially false and misleading statements that describe the overall purpose for each JKV Fund as acquiring and renovating homes for resale or rental.

47.    Kralik is a party to Fund I's LP Agreement along with the fund's general partner, JKV Capital, and JKV Capital's manager, JKV LLC. Fund I's LP Agreement states that the fund's purpose:

> shall be: (a) to acquire, own, improve, manage, and sell the Property; (b) to borrow money to finance the acquisition and improvement of the Property, and to modify and refinance such borrowings; (c) to manage, maintain, rent, sell or otherwise deal with the Property as contemplated by the terms of this Agreement; and (d) to do any all other acts and things necessary, incidental or convenient to carry on the Partnership business as contemplated under this Agreement.

48.    Fund I's LP Agreement defines "Property" as "those residential homes located in the counties of Los Angeles, Orange, Riverside, San Bernardino, and San Diego which are purchased in the sole and absolute discretion of the General Partner in accordance with the purpose of this Partnership."

49.    Likewise, Fund I's PPM, which Kralik helped prepare and approved, states that Fund I "was formed for the purpose of acquiring and managing single-family real estate assets," "[p]roceeds from the sale of Units will be for: real estate asset acquisition, renovation expenses, and certain operation expenses of the Fund," and Fund I "will seek to acquire and manage distressed and value add real estate assets with the intention of providing participating investors with a real estate focused

investment opportunity that combines income, principal investment growth, and elements of capital preservation."

50.    Kralik is a party to Fund II's LP Agreement along with the fund's general partner, JKV Capital, and JKV Capital's manager, JKV LLC. Fund II's LP Agreement states that the fund:

> is organized for the purpose of acquiring, owning, improving, and selling residential homes located in the counties of Los Angeles, Orange, Riverside, San Bernardino, and San Diego, California or for any other purpose on which the Partners agree . . . and engaging in all activities and transactions as the GP may deem necessary or advisable in connection therewith and doing such other lawful acts as the GP may deem necessary or advisable in connection with the maintenance and administration of the Partnership.

51.    Likewise, Fund II's PPM, which Kralik helped prepare and approved, states that the fund "was formed for the purpose of acquiring stressed or undervalued Single Family Residential ("SFR") homes, renovating the asset, and selling," "[p]roceeds from the sale of Units will be used for real estate purchases, real estate asset renovations, fund management expenses, and brokerage commissions," and "[t]he intention of the Fund is providing participating investors with a real estate focused investment opportunity that combines income, principal investment growth, and capital preservation."

52.    The LP Agreements for Investors A, Investors C, and Treasure Valley (each of which Kralik signed on behalf of both the fund's general partner JKV Capital and JKV Capital's manager JKV LLC) contain nearly identical language to the language quoted above in paragraph 50 from the Fund II LP Agreement. The only differences are the location of the real estate and immaterial changes in syntax.

53.    Each of the statements quoted or incorporated above is materially false and misleading because, as discussed below, the Defendants instead misused and

misappropriated investor money for Kralik's personal gain and other improper purposes. By virtue of his role in preparing, approving, and/or signing the documents above, and his role in misusing and misappropriating investor money described below, Kralik knew, or was reckless or negligent in not knowing, that these statements were materially false and misleading.

> **2.    The Defendants Made Materially False and Misleading Statements About the Specific Uses of Investor Money.**

54.    JKV Fund documents also contain numerous materially false and misleading statements about the specific uses of investor money.

55.    For example, in December 2017, Kralik signed a Form D for Fund I that was then filed with the SEC. A Form D is a form used to file a notice of an exempt offering of securities. The form is filed online with the SEC and is publicly available on the SEC's website, and details certain material facts about the company and offering for investors, such as the type of securities offered, the minimum investment amount, and the use of offering proceeds. The December 2017 Form D for Fund I falsely represented that no gross proceeds from Fund I had been or were proposed to be used for payments to Kralik, the only named executive officer. Nonetheless, tax returns show that in 2017, JKV LLC received a total of $45,000 from Fund I for nonemployee compensation. Such compensation is also strictly prohibited by Fund I's LP Agreement, which states that the fund "shall not provide reimbursement" for "salaries, compensation, fringe benefits, and other payments to employees, officers, and directors of the General Partner or Affiliates."

56.    In addition, in December 2019, Kralik signed a Form D for Fund II, which was filed with the SEC and which falsely represented that no gross proceeds were proposed to be used to pay any named executive officers. Kralik was the only executive officer named in the December 2019 Form D. He proceeded to use Fund II money for his personal expenses, as discussed below.

57.   Offering documents for each fund list JKV Capital's permitted fees and expenses relating to each fund's operations, plus JKV Capital's right to receive a percentage of the net profits or income from each fund it manages. The offering documents also state that each JKV Fund should reimburse JKV Capital (or for Fund I, Kralik) if it paid for that JKV Fund's organization or operating expenses. Aside from these fees, profit shares, and reimbursements, the JKV Fund offering documents do not authorize payments to JKV Capital.

58.   For example, Fund I's LP Agreement states, in relevant part, that JKV Capital, as the General Partner, "shall receive the following payments:

(a) The Partnership shall pay the General Partner an annual asset management fee of one percent (1%) … of the gross market value of all of the Partnership's assets under management …

(b) … an asset acquisition fee equal to one percent (1%) of the gross purchase price … paid for any real property acquired …

(c) In the event that the General Partner or Affiliate renders services or provides goods to the Partnership which it would not be required to provide without charge as a general partner, the Partnership shall pay the General Partner or Affiliates for those services or goods, but only to the extent that the payment would not exceed that which would be charged by an independent, capable third party willing to render those services or to provide those goods.

(d) The Partnership shall reimburse the General Partner for the actual costs of goods or services used by or on behalf of the Partnership…"

59.   Additionally, Fund I's LP Agreement specifically prohibits reimbursements of overhead expenses of JKV Capital, including general office expenses, salaries, compensation, fringe benefits, and other payments to employees, officers, and directors of the general partner. Specifically, the LP Agreement states:

[t]he Partnership shall not provide reimbursement for the following expenses, except where permitted by this Agreement: ([i]) overhead expenses of the General Partner, including but not limited to rent and general office expenses; (ii) salaries, compensation, fringe benefits, and other payments to employees, officers, and directors of the General Partner or Affiliates; and (iii) the cost of providing any goods or rendering any services for which the General Partner or Affiliate is entitled to compensation under this Agreement.

60.     Fund II's LP Agreement provides that JKV Capital, as the general partner of the fund, is entitled to a 1% management fee, a 1% acquisition fee, certain brokerage commissions, organizational expenses, and other specified expenses such as legal and accounting fees. None of the specified expenses are JKV Capital's own overhead costs (such as JKV Capital employee salaries). The agreement does provide that JKV Capital can be reimbursed for "other similar expenses related to the Partnership, as the [General Partner] determines in its sole discretion." But none of the listed expenses (such as legal and accounting fees) are similar to JKV Capital paying its own overhead costs.

61.     The LP Agreements for Investors A, Investors C, and Treasury Valley state that JKV Capital, as the general partner of the funds, is entitled to a management fee, acquisition fees, certain brokerage commissions, a construction management fee, organizational expenses, and other specified expenses. None of the specified expenses are JKV Capital's own overhead costs (such as JKV Capital employee salaries). These agreements do provide that JKV Capital can be reimbursed for "other similar expenses related to the Partnership, as the [General Partner] determines in its sole discretion." But none of the listed types of expenses are similar to JKV Capital paying its own overhead costs.

62.     The LP Agreements govern how each JKV Fund is supposed to operate until all investors have redeemed their investment. Kralik's repeated misappropriation

of investor money during the pendency of these agreements was part of his scheme to defraud investors. In addition, Kralik misused Fund I and Fund II money while he continued raising money from new investors using the PPMs and LP Agreements for those funds.

63.    All of the representations quoted and incorporated above regarding the specific use of investor money are materially false and misleading because, as discussed below, the Defendants instead misused and misappropriated investor money for Kralik's personal gain and other improper purposes. By virtue of his role in preparing, approving, and/or signing the documents above, and his role in misusing and misappropriating investor money described below, Kralik knew, or was reckless or negligent in not knowing, that these statements were materially false and misleading.

### 3.    The Defendants Made Materially False and Misleading Statements About Preserving Investors' Capital.

64.    In connection with their fraudulent scheme, the Defendants made material misrepresentations to investors promising capital preservation as an investment objective.

65.    Kralik, JKV Capital, and JKV LLC promoted the Fund I and Fund II as income generating real estate funds with capital preservation. For example, Fund I's PPM and Synopsis of Operations states that the fund intends to provide "participating investors with a real estate focused investment opportunity that combines income, principal investment growth, and elements of capital preservation."

66.    Fund II's PPM and Synopsis of Operations similarly describes "a real estate focused investment opportunity that combines income, principal investment growth, and capital preservation." Kralik and JKV Capital made a video presentation to raise money for Fund II that was posted on the feeder fund's website around July 2020. In the video, Kralik touted capital preservation as a key feature of Fund II.

67.     Each of these statements about the preservation of investor money is materially false and misleading because the Defendants instead misused and misappropriated investor money for Kralik's personal gain and other improper purposes, which reduced the value of investors' capital. By virtue of his role in preparing, approving, and/or signing the documents above, and his role in misusing and misappropriating investor money described below, Kralik knew, or was reckless or negligent in not knowing, that these statements were materially false and misleading.

### 4. Kralik and JKV Capital Made Additional False Statements to Investors Regarding Fund II.

68.     Kralik and JKV Capital also made materially false representations to investors regarding the safeguarding of investors' contributions to Fund II.

69.     Fund II's PPM and subscription agreement provide that investor money would be deposited and held in a segregated escrow account at a designated bank until a minimum of $5 million was raised, and all invested funds would be returned to investors if $5 million was not raised by April 1, 2020, or if the offering period was extended, by October 2020, stating:

> The Company has set a minimum offering proceeds figure of $5,000,000 (the "minimum offering proceeds") for this Offering. The Company has established a segregated Company managed bank account with [Bank], into which minimum offering proceeds will be placed. At least 5,000 Units must be sold for $5,000,000 before such proceeds will be released from the Holding Account and utilized by the Company. Should the Offering fail to reach the Minimum Offering Amount by the end of the Offering Term, then all invested funds held in the Holding Account will be returned in full immediately to subscribed investors and any subscription agreements executed between subscribed investors and the Company will be void ab initio.

19

70.    Kralik and JKV Capital, however, failed to safeguard Fund II investor proceeds in a segregated escrow account and return the capital contributions to investors as promised when the $5 million minimum offering amount was not raised for this fund. The statements were false because no escrow account existed and investor money was not segregated. Instead, investor contributions were deposited into a Fund II checking account and commingled with money from other JKV Funds and Kralik's wholly-owned entity, JKV LLC. In addition, Fund II never raised more than $4 million.

71.    Kralik knew, or was reckless or negligent in not knowing, that his statements promising to safeguard investors' contributions were false given his complete control over the decision-making for the JKV Funds and JKV Capital. A reasonable investor would have wanted to know if the Defendants would maintain a segregated escrow account, as promised, and return their investment contributions if the minimum offering amount was not reached.

**D.    The Defendants Defrauded Investors by Misappropriating and Misusing Investor Money.**

**1.    Kralik Admitted in Early 2023 That He Misused Fund Money.**

72.    In or around January 2023, Kralik admitted to an individual who had invested in Fund I and Fund II that Kralik was in trouble because Kralik had used investor money to cover certain JKV Capital operating costs and that a lot of investor money was gone. In a subsequent meeting with that investor and other investors, Kralik again admitted that he had taken money from the funds to pay JKV Capital employee salaries and operating expenses. At that meeting, when an investor asked Kralik if that meant Kralik had used investor money fraudulently, Kralik responded "Yes."

73.    In fact, Kralik's misuse and misappropriation were more widespread than he confessed. Kralik misused and misappropriated investor money for his personal benefit, for JKV Capital's benefit, and for the benefit of the other funds.

### 2. Kralik Misappropriated Money From the JKV Funds for his Personal Benefit.

#### a. From the Beginning, Kralik Stole Investor Money and Lied.

74.     Contrary to the representations in the offering documents set forth above, Kralik repeatedly misappropriated investor money for his own personal benefit. Many of the improper transfers for Kralik's benefit were documented on the books and records of the JKV Funds as money "due to" the JKV Funds by JKV LLC or JKV Homes. The comingling of assets described in this complaint, and record-keeping irregularities discovered during the SEC's investigation suggest that the amount the Defendants misappropriated could exceed what is shown in these books and records. Still, according to the JKV Funds' own books and records, as of the third quarter of 2022, Kralik, mostly through JKV LLC, owed the JKV Funds a total of about $1.6 million, as shown in the following chart.

| Amounts Owed to JKV Funds by Kralik as of Q3 2022 | |
|---|---|
| | **Amount Owed by Kralik** |
| **Fund I** | $373,402 |
| **Fund II** | $254,668 |
| **Investors A** | -$87,938 |
| **Investors C** | -$13,250 |
| **Treasure Valley** | $1,122,450 |
| **Total** | **$1,649,332** |

75.     Additionally, although the books and records list the amounts as "due to" the JKV Funds, there are no loan documents or other documents supporting a legitimate business purpose for these transfers. In any event, such loans still would have violated the terms of the JKV Funds LP Agreements and/or PPMs.

76.     Kralik's misuse of investor money started from the beginning of the JKV Funds' operations. In September and October 2017, Kralik directed the transfer of at

least $30,000 from the first investor contributions in Fund I to his wholly-owned entity, JKV LLC without documenting an authorized purpose.

    **b.**  **Kralik Stole Investor Money to Pay for His Car, House, Vacation, and Other Personal Expenses.**

  77.  Kralik misappropriated investor money to pay personal expenses, including: car payments; mortgage payments; deposits into his personal securities trading account; a vacation in Cabo San Lucas, Mexico; payments to his daughter's nanny and swim instructor; and payments to a social club in Newport Beach, CA.

  78.  A number of instances where Kralik stole investor money follow a similar, clear pattern. For instance:

*Car Payment*

  79.  On August 23, 2022, one of JKV LLC's bank accounts had an ending daily balance of only $131.54. On August 24, 2022, Kralik transferred $5,000 from a Fund I bank account to that JKV LLC bank account. No other funds were deposited or transferred into the JKV LLC bank account on August 24, 2022. That same day, Kralik made a payment of $3,474.88 from the JKV LLC bank account for a Mercedes-Benz SUV leased in his name.

*Mortgage Payments*

  80.  Kralik also used money from the JKV Funds to pay the monthly mortgage on his personal residence. For instance, on October 18, 2021, one of JKV LLC's bank accounts had an ending balance of $841.45. On October 21, 2021, Kralik transferred $4,000 from an Investors C bank account, $8,000 from a Fund I bank account, and $2,000 from a JKV Homes bank account into that JKV LLC bank account. No other deposits were made into that JKV LLC bank account between October 18 and October 21, 2021. On October 21, 2021, Kralik made a mortgage payment for his personal residence of $13,325.18 from that JKV LLC bank account.

  81.  Similarly, on April 20, 2022, one of JKV LLC's bank accounts had an ending daily balance of only $9.88. On April 21, 2022, Kralik transferred $15,000

from a Fund II bank account into that JKV LLC bank account. No other deposits were made into that JKV LLC account on April 21, 2022. That same day, Kralik made a mortgage payment for his personal residence of $13,325.18 from that JKV LLC bank account.

82.    On December 20, 2022, Kralik made a mortgage payment for his personal residence of $13,358.74 from a JKV LLC bank account, which resulted in an ending daily balance of -$12,470.35. On December 21, 2022, Kralik transferred $13,000 from an Investors A account along with $7,500 from other sources into the JKV LLC account to cover the overdraft in the account caused by the mortgage payment. No other deposits were made into that JKC LLC account on December 21, 2022.

### Personal Securities Brokerage Account

83.    In another example, on March 26, 2020, one of JKV LLC's bank accounts had an ending daily balance of $770.90. On March 27, 2020, Kralik transferred $5,000 from a Fund I bank account into that JKV LLC bank account. No other deposits were made into that JKV LLC bank account on March 27, 2020. That same day, Kralik transferred $3,000 from the JKV LLC account to his personal securities brokerage account.

### Childcare and Swim Lessons

84.    On April 14, 2021, one of JKV LLC's bank accounts had an ending daily balance of $431.33. On April 15, 2021, Kralik transferred $15,000 from a Treasure Valley bank account into that JKV LLC bank account. No other deposits were made into that JKV LLC bank account on April 15 or April 16, 2021. On April 16, 2021, Kralik made a payment of $1,000 from that JKV LLC bank account for a mortgage on a property he personally owned and two checks written from the JKV LLC bank account were cashed in the amounts of $318.75 and $475 for nanny payments and swim lessons for Kralik's daughter.

*Social Club*

85.    On May 10, 2022, one of JKV LLC's bank accounts had a negative ending daily balance of -$805.29. On May 11, 2022, Kralik's waterfront social club in Newport Beach, California cashed a check for $1,516.39 that was issued from that JKV LLC bank account. That same day, Kralik transferred $3,000 from a Fund I account to the JKV LLC account to cover the overdraft in the account caused in part by the check issued to his social club. No other deposits were made into that JKV LLC bank account on May 11, 2022.

*International Vacation*

86.    On December 1, 2022, one of JKV LLC's banking accounts had a beginning balance of $397.94. On December 2, 2022, Kralik transferred $7,500 from a Treasure Valley bank account into that JKV LLC bank account. On December 5, 2022, Kralik transferred an additional $25,000 from the Treasure Valley bank account into the JKV LLC bank account. No other deposits were made into the JKV LLC bank account between December 2 and December 5, 2022. On December 5, 2022, Kralik made payments and withdrew money from several stores and ATMs while on vacation in Cabo San Lucas, Mexico. Kralik's payments and ATM withdrawals from the JKV LLC account while in Cabo San Lucas totaled $4,295.62 (including international transaction and ATM fees).

### c.    Kralik Improperly Transferred Fund Money to His Personal Investment Vehicle JKV Homes.

87.    According to the JKV Funds' books and records, Relief Defendant JKV Homes—an entity Kralik uses for personal real estate investments unrelated to the JKV Funds—owed the JKV Funds over $350,000 as of the third of quarter 2022, as shown in the below chart:

| Amounts Owed to JKV Funds by JKV Homes as of Q3 2022 | |
|---|---|
| | **Amount Owed by JKV Homes** |
| **Fund I** | $95,528 |
| **Fund II** | $259,871 |
| **Investors A** | N/A |
| **Investors C** | N/A |
| **Treasure Valley** | $3,520 |
| **Total** | **$358,919** |

88.     According to bank records, as of early 2024, JKV Homes still retained at least $177,000 of the money it had received from the JKV Funds.

89.     Fund offering documents do not authorize transfers of money from the JKV Funds to JKV Homes. JKV Homes has no legitimate claim to the ill-gotten funds and has been unjustly enriched by its receipt of this fund money. JKV Homes therefore should be required to disgorge all of the net amounts it directly or indirectly received from the JKV Funds, as well as to pay prejudgment interest on such amounts.

90.     Kralik, as the signatory on and party to the fund offering documents discussed above (which contain representations about how fund money would be used) knew, or was reckless or negligent in not knowing, that the transfers to JKV LLC and JKV Homes were not permitted by the terms of the fund offering documents and were improper.

91.     In deciding whether to invest in the JKV Funds, investors would have considered it important to know whether the Defendants would misappropriate fund money for Kralik's own enrichment, and multiple investors have confirmed this to the SEC's staff investigating this matter.

92.     Based on the facts alleged above, the Defendants intentionally, knowingly, recklessly, and/or negligently carried out their fraudulent scheme involving the misappropriation of investor money.

### 3.    Kralik and JKV Capital Also Misused Investor Money Through Improper Transfers to JKV Capital.

93.    Kralik and JKV Capital misused investor money by directing improper transfers to JKV Capital. Although JKV Capital was entitled to (and received) a percentage of profits, and certain fees/reimbursements discussed above, the improper transfers to JKV Capital are in addition to those categories of expenses.

94.    Among the JKV Fund books and records maintained by JKV Capital are general ledger sub-accounts called the "Due Fr/To JKV Capital" accounts. A negative balance in this account in any of the JKV Fund's books and records reflects that JKV Capital owes that JKV Fund money.

95.    The "Due Fr/To JKV Capital" accounts, along with other books and records for the JKV Funds, including quarterly balance sheets, indicate that starting in mid-2018 and continuing until at least November 2023, JKV Capital owed significant amounts of money—at times millions of dollars—to the JKV Funds. Beginning in early 2020, numerous entries in the "Due Fr/To JKV Capital" accounts for money transferred to JKV Capital from the JKV Funds have no explanation for the transfer noted. For example, according to Fund I's "Due Fr/To JKV Capital" account, in June 2022 alone, at least 17 transfers totaling over $240,000 were made to JKV Capital with no explanation or purpose noted for any of them. Additionally, there are no loan documents or other documents supporting a legitimate business purpose for these transfers. In any event, such loans still would have violated the terms of the JKV Funds LP Agreements and/or PPMs.

96.    As of September 30, 2022, the books and records show the amounts that JKV Capital owed to the JKV Funds was close to $4 million, as shown in the following chart.

| Improper Payments from JKV Funds to JKV Capital as of Q3 2022 | |
|---|---|
| | **Amount Owed by JKV Capital** |
| **Fund I** | $1,401,862 |
| **Fund II** | $1,945,430 |
| **Investors A** | $355,137 |
| **Investors C** | $30,487 |
| **Treasure Valley** | $224,919 |
| **Total** | **$3,957,835** |

97.   Some of the money transferred from JKV Funds to JKV Capital was used to cover JKV Capital's own costs, including employee payroll, when JKV Capital's accounts lacked sufficient funds.

98.   The transfers from Fund I to JKV Capital for operating expenses including employee salaries are expressly prohibited by Fund I's LP Agreement. That agreement specifically prohibits reimbursements of overhead expenses of JKV Capital, including general office expenses, salaries, compensation, fringe benefits, and other payments to employees, officers, and directors of the general partner. JKV Capital, JKV LLC, and Kralik are all parties to the Fund I's LP Agreement.

99.   Documents for other JKV Funds do not expressly prohibit reimbursement of these expenses, but, as discussed above, do specify precisely which fees and expenses JKV Capital is entitled to. Reimbursement for employee salaries is not a permitted item. And although some of the agreements allow JKV Capital to get reimbursed for "other similar" expenses, JKV Capital employee payroll is not similar to the listed expenses. Moreover, Kralik's later confession that the transfers to JKV Capital were fraudulent confirms that these were not permissible expenses.

100.   Given his role in preparing, approving, and/or signing numerous documents setting forth the permitted uses of investor money and permissible fees to JKV Capital, Kralik knew, or was reckless or negligent in not knowing, that these transfers to JKV Capital for JKV Capital's expenses were improper. Additionally, in

early 2022, Accountant A told Kralik that he would not transfer money from the JKV Funds to JKV Capital for employee payroll or other unauthorized purposes without documentation that the funds' limited partners agreed to such transfers. Notwithstanding no such documentation, Kralik continued to make unauthorized transfers from the JKV Funds to JKV Capital throughout 2022.

101.    When deciding whether to invest in the JKV Funds, investors would have considered it important to know that investor money would be used to make illicit payments to JKV Capital. Two investors have given sworn statements attesting that if they had known investor money would be transferred to JKV Capital beyond the amount that JKV Capital was owed, they would not have invested.

102.    Based on the facts alleged above, the Defendants intentionally, knowingly, recklessly, and/or negligently carried out their fraudulent scheme by making unauthorized transfers to JKV Capital.

### 4.    Kralik, JKV Capital, and JKV LLC Misused Investor Money By Making Illicit Fund-to-Fund Transfers.

#### a.    The Defendants Improperly Transferred Millions of Dollars Between Funds.

103.    As discussed above, the offering documents for each JKV Fund make clear that the money invested in each fund should have been used solely for the purposes of that fund. Contrary to these representations, between October 2019 and March 2024, Kralik transferred or directed transfers totaling over $8 million directly from bank accounts held by JKV Funds into accounts held by other JKV Funds, or to pay expenses owed by other JKV Funds.

104.    Like the other improper transfers discussed above, the improper fund-to-fund transfers were documented as liabilities on the books and records of the funds. Transfers between the funds were posted to liability accounts in the general ledgers for each JKV Fund. Those general ledger liability account balances and quarterly balance sheets show that certain JKV Funds owed money to other JKV Funds.

Additionally, although the books and records list the amounts as owed from one JKV Fund to another, there are no loan documents or other documents supporting a legitimate business purpose for these transfers. In any event, such loans still would have violated the terms of the JKV Funds LP Agreements and/or PPMs.

105.   Contrary to JKV Fund documents, which represented to investors that their investment in a fund was specific to that particular fund, Kralik misused investor money by frequently making fund-to-fund transfers directly or by using JKV LLC as an intermediary. The Defendants knew or were reckless or negligent in not knowing that the statements about the use of investor money were false given their role in misusing fund money.

106.   The Defendants made numerous and frequent fund-to-fund transfers. For instance, in March 2022 alone, Kralik made or authorized fifteen transfers into a Fund I bank account from other JKV Funds, and also made or authorized six transfers from that Fund I bank account to other JKV Funds.

107.   The following chart shows the approximate aggregate net amounts directly transferred between the JKV Funds.

| Net Direct Fund-to-Fund Transfers from October 2019 to April 2024 | | | |
|---|---|---|---|
| | Sent to Other JKV Funds | Received From Other JKV Funds | Net Sent to Other JKV Funds |
| Fund I | $3,091,703 | $4,220,045 | -$1,128,342 |
| Fund II | $3,099,777 | $2,857,500 | $242,277 |
| Investors A | $380,020 | $185,519 | $194,501 |
| Investors C | $74,236 | $41,110 | $33,126 |
| Treasure Valley | $1,402,598 | $744,160 | $658,438 |
| Totals | $8,048,334 | $8,048,334 | |

108.    Additionally, of the over $4 million that Kralik transferred or had transferred from certain JKV Funds to the bank account for JKV LLC, he subsequently transferred at least $700,000 of that money to other JKV Funds.

109.    When deciding whether to invest in the JKV Funds, investors would have considered it important to know that the Defendants would make fund-to-fund transfers. Two investors attested they would not have invested in the JKV Funds had they known that investor money would be transferred between JKV Funds.

110.    Even for Fund I, which over a four-year time frame ultimately received more money from other funds than it transferred out, investors in Fund I were defrauded by receiving capital account statements falsely claiming that distributions were from Fund I's profits. In fact, certain distributions to Fund I investors came from other JKV Funds. Thus, these investors (who had the right to request redemptions of their money) were lulled into believing that their money was safe and their investment was prosperous, when in fact some of the purported gains came from improper transfers from other JKV Funds. Any reasonable investor would consider it important to know whether the gains shown on an account statement represented actual gains from the business operations of that fund and not from the proceeds of other funds.

**b.    The Improper Fund-to-Fund Transfers Started Early On and Continued Throughout the Relevant Period.**

111.    In one early example, on October 29, 2019, a Fund II bank account had a beginning balance of $1,000. On that same day, a Fund II investor transferred his $500,000 contribution into that Fund II bank account. No other deposits were made into the Fund II bank account between October 29 and November 5, 2019. On November 5, 2019, Kralik transferred $46,180 from that Fund II account to a Fund I account.

112.    On April 9, 2021, a JKV LLC bank account had an ending daily balance of $477.44. On April 12, 2021, Kralik transferred $75,000 from a Treasure Valley

bank account and $7,500 from an Investors A bank account into the JKV LLC bank account. No other deposits were made into JKV LLC's bank account between April 9 and April 12, 2021. On April 12, 2021, Kralik made transfers totaling the following amounts out of the JKV LLC bank account: $53,500 to a Fund I bank account, $5,350 to an Investors C bank account, and $22,000 to a Fund II bank account.

113.    On May 10, 2023, a Fund I bank account had a beginning balance of $986.66. That same day, the Fund I bank account received a deposit of $571,712.11 from an escrow company in connection with the sale of a Fund I property. No other deposits were made into that Fund I bank account on May 10 and May 11, 2023. On May 11, 2023, Kralik transferred $71,000 from the Fund I property sale proceeds to a bank account held by Treasure Valley.

### c.    Kralik Made Improper Fund-to-Fund Transfers to Facilitate Ponzi-like Payments to Other Investors.

114.    Some of the improper fund-to-fund transfers were used for Ponzi-like distribution payments to investors in other JKV Funds, which is part of the fraudulent scheme and also contrary to the Defendants' representations that investors would receive profits from the particular fund they invested in.

115.    In one example, on August 17, 2021, a Fund II bank account had a beginning balance of $75.14. That same day, Kralik transferred $65,000 from a Fund I bank account to Fund II's bank account. That same day, Kralik used most of the money received by Fund II from Fund I to make a distribution payment of $60,954.71 to an investor in Fund II. JKV Capital then provided a Q3 2021 capital account statement to this Fund II investor falsely indicating that the recent $180,000 in profit share distributions were from Fund II's quarterly profits. To the contrary, close to $61,000 of those distributions had come from money taken from Fund I, in which this investor was not a participant.

116.    In an additional example, on January 14, 2022, a Fund II bank account had a beginning balance of $32,984.58. That same day, Kralik transferred in

$225,000 to that account (consisting of $160,000 from a Fund I bank account, $50,000 from JKV LLC, and $15,000 from JKV Capital). That brought the balance in the Fund II bank account to $257,984.58. No other deposits were made into the Fund II bank account on that day. That same day, Kralik made redemption and distribution payments totaling $226,354.42 to Fund II investors from that Fund II account.

117.   In another example of Ponzi-like fund-to-fund transfers, on March 30, 2022, Fund II's bank account had a beginning balance of $502.44. That same day, Kralik transferred $115,000 from a Treasure Valley bank account and $60,000 from a Fund I bank account into Fund II's bank account. Kralik also transferred $27,000 from a JKV Capital bank account and $3,000 from a JKV Homes bank account into that same Fund II account. No other deposits were made into the Fund II bank account on that day. That same day, Kralik made distribution payments of $187,168.78 and $17,535.69 to Fund II investors from the Fund II account.

118.   In a further example, on December 13, 2022, a Fund I bank account had a beginning balance of $562.06. That same day, Kralik transferred $21,100 from a Fund II bank account to the Fund I bank account. No other deposits were made into the Fund I bank account on that day. That same day, two Fund I investors cashed checks issued from the Fund I bank account in the amounts of $6,168.16 and $15,420.40.

**d.      The Defendants Made Improper Transfers that Concealed Shortfalls When a Fund Could Not Make Mortgage Payments or Other Property-Related Costs.**

119.   Kralik improperly transferred money from one JKV Fund for operating expenses of another JKV Fund, such as payments to mortgage companies and other costs. This use of fund money conflicts with the stated purpose of each JKV Fund to operate a real estate business for the investors participating in that specific fund. It also concealed from investors that there were shortfalls in the funds.

120.   For example, on October 15, 2020, Kralik used money from Fund II to make a payment to a mortgage company on behalf of Fund I. On that day, a Fund I bank account had a beginning balance of $5,345.47. Kralik then authorized the transfer of $55,000 from a Fund II bank account into the Fund I bank account. No other deposits were made into this Fund I bank account on October 15, 2020. That same day, Kralik made a payment to a mortgage company of $58,352.31 from the Fund I account.

121.   In another example, on October 13, 2021, Kralik used money from Treasure Valley to make a payment to a mortgage company on behalf of Fund II. On that day, a Fund II bank account had a beginning balance of $3,712.78. That same day, Kralik authorized a transfer of $35,000 from a Treasure Valley bank account into a Fund II bank account. No other deposits were made into this Fund II bank account on October 13, 2021. That same day, Kralik made a payment to a mortgage company of $34,829.15 from the Fund II account.

122.   Kralik also transferred money directly to escrow companies from JKV Funds for payments relating to properties held by other JKV Funds. For instance, on March 25, 2021, Kralik authorized a transfer of $140,281.57 from a Fund II bank account to an escrow company in connection with the purchase of a Fund I property.

123.   Fund offering documents do not authorize these transfers of money between the JKV Funds or to other entities for the benefit of other JKV Funds. These transfers for mortgages and other operating costs were not made in the form of loans and were not made in pursuit of the partnerships' purposes. Nor did investors give consent to the transfers.

124.   Given his role in preparing, approving, and/or signing the fund offering documents discussed above, Kralik knew, or was reckless or negligent in not knowing, that the fund-to-fund transfers were improper.

125.   Additionally, in early 2022, Accountant A raised concerns to Kralik about being directed to transfer money between the JKV Funds if the transfers were

not authorized in writing by the funds' limited partners. Accountant A refused to continue making these transfers. Nevertheless, even after Accountant A raised concerns, Kralik kept making improper fund-to-fund transfers throughout 2022, 2023 and into 2024.

126.   Based on the facts alleged above, the Defendants intentionally, knowingly, recklessly and/or negligently carried out their fraudulent scheme by making illicit fund-to-fund transfers.

### 5.   The Defendants Diminished the Equity in Properties and Concealed the Fraud by Incurring a Large Amount of Debt.

127.   Throughout the Relevant Period, the Defendants took out large mortgages and loans encumbering properties owned by Fund I, Fund II, Investors A, and Treasure Valley, resulting in very little, if any, equity in the properties owned by those funds.

128.   Balance sheets for Fund I as of the first quarter of 2022 and Fund II as of the third quarter 2022 show those funds owed mortgage companies significantly greater amounts than investors' contributions and greater amounts than the total purchase price of the properties. Kralik, JKV Capital, and JKV LLC also took out large amounts of debt against the properties held by Investors A and Treasure Valley, resulting in little equity in those properties. The large amount of debt diminished the equity in the properties and the value of investors' capital investments in these four funds.

### E.   The Defendants' Scheme Unravels.

129.   Near the end of 2022, Kralik conveyed to an employee that there was a shortfall of millions of dollars for JKV Fund investors. After the SEC issued a January 2023 document subpoena to JKV Capital, Kralik ceased making regular distributions to investors (Kralik had stopped raising money from investors prior to January 2023). Kralik then sold some of the remaining valuable properties and provided payments to only some investors.

34

130.   In early 2023, JKV Capital again retained Accountant A to make adjustments to the December 31, 2022 entries in the books and records for the JKV Funds and JKV Capital. Among other adjustments, Accountant A recognized some of the unauthorized fund-to-fund transfers and improper transfers to JKV Capital, which resulted in at least $1.8 million in losses for Fund I and Fund II. As a result, the fourth quarter 2022 capital account statements for Fund I and Fund II showed a substantial decrease in the value of each investor's capital in those two funds.

131.   In January 2023, Kralik confessed part of his fraud to some of his investors, as discussed above.

**FIRST CLAIM FOR RELIEF**

**Violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder**

**(against all Defendants)**

132.   The SEC realleges and incorporates by reference paragraphs 1 through 131 above.

133.   As set forth above, the Defendants engaged in a scheme to defraud by misappropriating investor money (i) for Kralik's own enrichment through transfers of money to Kralik and to his companies, JKV LLC and JKV Homes; (ii) through unauthorized transfers to JKV Capital, and (iii) through improper fund-to-fund transfers.

134.   As set forth above, Defendants made material misstatements and omissions concerning the use of investor money, the preservation of investors' capital, the safekeeping of investor money in a segregated account for Fund II, and the return of investors' contributions when Fund II did not raise a minimum of $5 million.

135.   By engaging in the acts and conduct alleged in this Complaint, the Defendants directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, with scienter: (a) employed devices, schemes, or artifices to defraud, (b)

made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

136.    By reason of the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (against all Defendants)

137.    The SEC realleges and incorporates by reference paragraphs 1 through 136 above.

138.    As set forth above, the Defendants engaged in a scheme to defraud by misappropriating investor money (i) for Kralik's own enrichment through transfers of money to Kralik and to his companies, JKV LLC and JKV Homes; (ii) through unauthorized transfers to JKV Capital, and (iii) through improper fund-to-fund transfers.

139.    The Defendants obtained money from investors by making material misstatements and omissions concerning the use of investor money, the preservation of investors' capital, the safekeeping of investor money in a segregated account for Fund II, and the return of investors' contributions when Fund II did not raise a minimum of $5 million.

140.    By engaging in the conduct described above, the Defendants, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser of the securities offered or sold by the Defendants.

141.    By reason of the conduct described above, the Defendants violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**THIRD CLAIM FOR RELIEF**

**Control Person Violations of Exchange Act Section 10(b) and Rule 10b-5**

**thereunder, pursuant to Exchange Act Section 20(a)**

**(against Kralik)**

142.    The SEC realleges and incorporates by reference paragraphs 1 through 141 above.

143.    At all relevant times herein, Kralik was a control person of JKV Capital and JKV LLC because he possessed, directly or indirectly, and exercised actual control over the operations of JKV Capital and JKV LLC. Kralik owns 55% of JKV Capital and 100% of JKV LLC, JKV Capital's manager. Kralik is a signatory on all relevant bank accounts and improperly directed transfers out of the JKV Fund accounts into accounts for other JKV Funds, JKV Capital, JKV LLC, and his entity JKV Homes. As CEO of JKV Capital, Kralik controls the business's day-to-day operations, and as JKV LLC's sole member and manager, he controls the operations of JKV LLC. He prepared, approved, signed, and was a party to fund documents on behalf of JKV Capital and JKV LLC. Kralik directly or indirectly caused JKV Capital and JKV LLC to misuse and misappropriate investor money. He also directly or indirectly caused JKV Capital and JKV LLC's false and misleading statements. Kralik did not act in good faith with regard to any of this conduct.

144.    Accordingly, pursuant to Section 20(a) of the Exchange Act, Kralik is liable to the SEC to the same extent as JKV Capital and JKV LLC would be liable for

their respective violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

### (against Relief Defendant JKV Homes)

145.    The SEC realleges and incorporates by reference paragraphs 1 through 144 above.

146.    As alleged above, Relief Defendant JKV Homes received ill-gotten gains from the Defendants' fraudulent scheme involving the misappropriation and misuse of fund money.

147.    Relief Defendant JKV Homes obtained ill-gotten gains described above as part of the securities law violations alleged above under circumstances in which it is not just, equitable, or conscionable for them to retain the funds. Relief Defendant JKV Homes does not have a legitimate claim to these funds.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that the Defendants committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Kralik, JKV Capital, and JKV LLC and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

**III.**

Issue an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Sections 2l(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting Defendant Kralik from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

**IV.**

Issue an order requiring Defendant Kralik jointly and severally with Defendant JKV Capital, and jointly and severally with Defendant JKV LLC to disgorge their ill-gotten gains, together with prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

**V.**

Issue an order requiring Relief Defendant JKV Homes to disgorge ill-gotten funds received by it and to which it has no legitimate claim, together with prejudgment interest thereon, pursuant to Sections 21(d)(3)(A)(ii), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)(A)(ii), 78u(d)(5), and 78u(d)(7)].

**VI.**

Issue an order requiring Defendants Kralik, JKV Capital, and JKV LLC to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, the SEC demands trial by jury.

Dated: July 2, 2024

*/s/ Stephen Kam*
STEPHEN KAM, Local Counsel
P. DAVIS OLIVER (*pro hac vice* pending)
JOHN M. MCNULTY (*pro hac vice* pending)

Attorneys for Plaintiff
Securities and Exchange Commission

Of counsel:

Christopher M. Bruckmann
Sarah E. Routh